**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> XIAO MEI, et al., ) <br> ) <br> Defendants. ) <br> ) <br> ) | Case No. 15-cv-1191 <br><br> **Judge Manish S. Shah** <br><br> **Magistrate Judge Young B. Kim** |

**Declaration of Graham Thatcher**

1

# DECLARATION OF GRAHAM THATCHER

I, Graham Thatcher, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I have been an employee of Deckers Outdoor Corporation, Goleta, California, ("Deckers") since February 2014. I am a Brand Protection Associate for Deckers. I am knowledgeable about or have access to business records concerning all aspects of the brand protection operation of the UGG Australia division of Deckers, including, but not limited to, its trademarks, copyrights, other intellectual property, sales, on-line sales, advertising, marketing, media coverage, and associated international operations. I make this declaration from matters within my own knowledge save where otherwise stated.

3. Deckers is well-known throughout the United States and elsewhere as a source of high quality footwear products, including the famous UGG brand of premium sheepskin footwear (the "UGG Products"). UGG Products are distributed and sold to consumers through retailers throughout the United States, including over 100 authorized retailers in Illinois, the uggaustralia.com website and UGG Concept Stores, including a Concept Store located at 909 North Rush Street in Chicago, Illinois.

4. Since acquiring the UGG trademarks and the goodwill of the business in 1995, Deckers has continuously sold footwear and clothing under the UGG trademarks and stylized variations and logos (collectively, the "UGG Trademarks"). Deckers has built substantial goodwill in the UGG Trademarks. The UGG Trademarks are famous and valuable assets of Deckers.

5. Deckers holds registrations for the UGG Trademarks in more than 100 countries around the world, including, but not limited to, the following United States registrations:

| REGISTRATION NUMBER | TRADEMARK | REGISTRATION DATE | GOODS |
|---|---|---|---|
| 3,050,925 | UGG | January 24, 2006 | For: Men's, women's and children's footwear, namely, boots, shoes, clogs, slippers; men's, women's and children's clothing, namely, coats, jackets; children's buntings in class 025. |
| 3,636,029 | ☀ | June 9, 2009 | For: Leather bags in class 018. |
| 3,825,543 | ☀ | July 27, 2010 | For: Coats; Jackets; Vests; Ponchos; Gloves; Mittens; Headwear; Wraps; Scarves; Sweaters in class 025. |
| 3,624,595 | ☀ | May 19, 2009 | For: Footwear in class 025. |
| 4,234,396 | UGG | October 30, 2012 | For: Footwear; clothing, namely, sweaters, coats, jackets, vests, ponchos, snow suits, scarves and gloves; headwear; children's buntings in class 025. |

6. The above U.S. registrations for the UGG Trademarks are valid, subsisting, in full force and effect, and some are incontestable pursuant to 15 U.S.C. § 1065. True and correct

3

copies of the above United States Registration Certificates are attached hereto as **Exhibit 1**.

7. The UGG Trademarks have been used continuously for many years, some since as early as 1979, by Deckers and its predecessors in interest. The UGG Trademarks are used on UGG Products and are famous among consumers worldwide, particularly with sheepskin footwear consumers. Deckers extensively markets the UGG Trademarks in the United States and other countries and (together with its predecessors) has spent tens of millions of dollars since 1979 to build the UGG brand. Deckers invests millions of dollars per year marketing its UGG brand.

8. Continuously from 1995 to the present, Deckers has done business under the trade name UGG Australia. Since well prior to 1995, Deckers' predecessors traded as UGG Australia. Our company is well known in the footwear industry and luxury goods markets as UGG Australia.

9. Deckers has expended considerable resources on advertising, marketing, and promoting the UGG Trademarks and in maintaining the distribution and sale of high quality products in connection therewith. As such, Deckers has established goodwill and a favorable reputation for itself and its UGG Trademarks. Deckers' UGG Trademarks are among its most valuable assets.

10. Exhibit Numbers 2-4, 6-7 and 9-21 attached hereto and referenced herein are true copies of clipsheets prepared by Deckers that show its UGG brand advertising and other media coverage, as well as true copies of unsolicited media coverage of the UGG brand.

11. Deckers' innovative marketing and product design have earned the UGG brand numerous awards and accolades, including 2003 and 2011 Brand of the Year honors in *Footwear*

*News* (**Exhibit 2**) and 2004, 2007, 2008, 2010 and 2011 Brand or Boot of the Year honors in *Footwear Plus* (**Exhibit 3**), two leading industry publications. Deckers was also selected as one of Forbes Best 200 Small Companies for multiple consecutive years (**Exhibit 4**).

12. Deckers' extensive marketing and innovative footwear designs have led to unprecedented growth for the UGG brand, achieving more than $1 billion in annual sales since 2011. In fiscal year 2013, sales for the UGG brand increased 9.7% to a record $1.299 billion. **Exhibit 5** is a true and correct copy of excerpts from Deckers' Annual Report for 2013.

13. An October 27, 2008 article in *Footwear News Magazine* entitled "UGG Gives Footwear Retailers a Big Boost" details the strength of UGG brand sales in an otherwise flat footwear market. (**Exhibit 6**). A 2010 *Wall Street Journal Magazine* article entitled "The Golden Fleece" further discusses the popularity of the UGG brand. (**Exhibit 7**).

14. UGG brand marketing and online sales represents a significant portion of Deckers' business. Since at least as early as April 1999, Deckers has operated a website at uggaustralia.com where it promotes and sells genuine UGG Products. **Exhibit 8** is a true copy of a portion of the uggaustralia.com website. Deckers also uses other domain names which redirect to this location. Deckers' uggaustralia.com website is extraordinarily successful, with 2013 e-commerce UGG brand sales totaling over $155 million, up from $118 million in 2012. (*See* **Exhibit 5**, *supra*).

15. Numerous magazines and newspapers have written stories about the widespread popularity of the UGG brand, including *Entertainment Weekly* (**Exhibit 9**). The continual success and popularity of the UGG brand as a highly sought after item (including through Internet sales) is reflected in search term results on popular online search engines and

auction sites. The UGG brand is consistently among the most searched for items during the holidays. *PRNewswire* reported in 2014 that "UGG" was the most searched term on Cyber Monday for the third year in a row and UGG products were once again named one of "Oprah's Favorite Things." (**Exhibit 10**). *Search Engine Watch* reported that "UGG boots" were the fourth most popular gift for which consumers searched on Black Friday in 2013. (**Exhibit 10**). The *Wall Street Journal* reported that UGG products were the number one products for which users searched online on Thanksgiving and Black Friday in 2012. (**Exhibit 10**). Similarly, "UGG boots" was the most searched apparel item for the four week period ending December 3, 2011. (**Exhibit 10**). According to *Time Magazine*, the three most searched fashion terms on the Internet over the 2007 holiday season were "UGG", "UGGS", and "UGG BOOTS". (**Exhibit 11**).

16. The UGG brand has also become well-known as being a favorite among internationally known celebrities, many of whom are featured wearing their UGG footwear in photographs published on the Internet, including Drew Barrymore, Cameron Diaz, Gwyneth Paltrow, Amber Valleta, Amanda Peet, Jennifer Lopez, Julia Roberts, Julia Stiles, Sharon Osbourne, and Leonardo DiCaprio. (**Exhibit 12**). Widespread and international media coverage for the UGG brand in multiple fashion and celebrity-oriented magazines has occurred in the U.S. and elsewhere, including articles in *Elle* (**Exhibit 13**) and *Vogue Australia* (**Exhibit 14**). Deckers augments this unsolicited media coverage with extensive paid advertising in upscale luxury magazines worldwide, such as *Elle* (**Exhibit 15**), *Glamour* (**Exhibit 16**), and *Vogue* (**Exhibit 17**).

17. Media exposure for the UGG brand is not limited to print periodicals. UGG boots have been featured on many television shows broadcasted around the world, including *Sex and*

*the City* (**Exhibit 18**) and the popular game show *Jeopardy!*. (**Exhibit 19**). UGG boots have also been featured on the Oprah Winfrey Show where Ms. Winfrey, in her annual "Holiday Favorite Things" segment, named an UGG boot as one of her favorite things multiple times. (**Exhibit 20**).

18. The widespread fame of the UGG brand for footwear has allowed Deckers to successfully extend the brand into clothing and accessories. (**Exhibit 21**).

19. The success of the UGG brand has resulted in its significant counterfeiting. Consequently, Deckers has a worldwide anti-counterfeiting program and regularly investigates suspicious websites and online marketplace listings identified in proactive Internet sweeps and reported by consumers. In recent years, Deckers has identified thousands of domain names linked to fully interactive websites and marketplace listings on platforms such as iOffer and Aliexpress, including the fully interactive commercial Internet websites operating under the Defendant Domain Names and/or the Online Marketplace Accounts identified in Schedule A attached to the Amended Complaint (collectively, the "Defendant Internet Stores"), which were offering for sale, selling, and importing counterfeit products, including boots bearing counterfeit versions of Deckers' federally registered UGG Trademarks (the "Counterfeit UGG Products") to consumers in this Judicial District and throughout the United States. Despite Deckers' enforcement efforts online and on the ground, Defendants have persisted in creating the Defendant Internet Stores, which generate massive profits selling Counterfeit UGG Products.

20. I perform, supervise, and/or direct investigations related to Internet-based infringement of the UGG Trademarks. Our investigation shows that Defendants are using the Defendant Internet Stores to sell Counterfeit UGG Products from foreign countries such as China to

consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed each of the Defendant Internet Stores and determined that Counterfeit UGG Products were being offered for sale to the United States, including Illinois. This conclusion was reached through visual inspection of the products listed for sale on the website, the price at which the Counterfeit UGG Products were offered for sale, other features commonly associated with websites selling counterfeit products, because Defendants offered shipping to the United States, including Illinois, and because Defendants and their websites do not conduct business with Deckers and do not have the right or authority to use the UGG Trademarks for any reason. Deckers also conducted searches of the public WhoIs information regarding the Defendant Domain Names and identified the e-mail addresses that the registrants provided to the Registrars. True and correct copies of screenshot printouts showing the active Defendant Internet Stores reviewed are attached as **Exhibit 22**, and WhoIs information for the Defendant Domain Names is attached as **Exhibit 23**.

21. Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores or wholesalers selling genuine UGG Products. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union and PayPal. Numerous Defendant Domain Names also incorporate the UGG Trademarks into the URL, and the Defendant Internet Stores often include Deckers' copyright-protected content, images, and product descriptions on the websites to make it very difficult for consumers to distinguish such counterfeit sites from an authorized retailer. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and

using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos. Deckers has not licensed or authorized Defendants to use its UGG Trademarks, and none of the Defendants are authorized retailers of genuine UGG Products.

22. Defendants also deceive unknowing consumers by using the UGG Trademarks without authorization within the content, text, and/or meta tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for UGG Products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine UGG Products. Further, Defendants utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down.

23. Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. For example, many of Defendants' names and physical addresses used to register the Defendant Domain Names are incomplete, contain randomly typed letters, or fail to include cities or states. Other Defendant Domain Names use privacy services that conceal the owners' identity and contact information. On information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Amended Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are

one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

24. Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores. For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names. In addition, Counterfeit UGG Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit UGG Products were manufactured by and come from a common source and that Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, similar hosting services, similar name servers, and the use of the same text and images, including content copied from Deckers' uggaustralia.com website.

25. In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is

received. Rogue servers are notorious for ignoring take down demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

26. Counterfeiters such as Defendants typically operate multiple credit card merchant accounts and PayPal accounts behind layers of payment gateways so that they can continue operation in spite of Deckers' enforcement efforts. On information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court.

27. Monetary damages cannot adequately compensate Deckers for ongoing infringement because monetary damages fail to address the loss of control of and damage to Deckers' reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to ascertain due to the inability to calculate measurable damage in dollars and cents caused to Deckers' reputation and goodwill by acts of infringement.

28. Deckers' goodwill and reputation are irreparably damaged when the UGG Trademarks are used on goods not authorized, produced, or manufactured by Deckers. Moreover, brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to Deckers' reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

29. Deckers is further irreparably harmed by the unauthorized use of the UGG Trademarks because counterfeiters take away Deckers' ability to control the nature and quality of the Counterfeit UGG Products. Loss of quality control over goods bearing the UGG Trademarks and, in turn, loss of control over our reputation is neither calculable nor precisely compensable.

30. The sale of Counterfeit UGG Products bearing the UGG Trademarks is likely causing and will continue to cause consumer confusion, which weakens Deckers' brand recognition and reputation. Consumers who mistakenly believe that the Counterfeit UGG Products they have purchased originated from Deckers will come to believe that Deckers offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine UGG Products, resulting in a loss or undermining of Deckers' reputation and goodwill. Indeed, there is damage to Deckers' reputation and goodwill even if a consumer knows that the goods he or she is purchasing are counterfeit. Prospective consumers who see inferior Counterfeit UGG Products worn by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of Deckers and the UGG Trademarks. Such post-sale confusion results in damage to Deckers' reputation and correlates to a loss of unquantifiable future sales.

31. Deckers is further irreparably damaged due to a loss in exclusivity. Deckers' footwear and apparel is meant to be exclusive. Deckers' extensive marketing and innovative footwear designs are aimed at growing and sustaining sales. The UGG Trademarks are distinctive and signify to consumers that the products originate from Deckers and are manufactured to Deckers' high quality standards. When counterfeiters use the UGG Trademarks on goods without Deckers' authorization, the exclusivity of Deckers' products, as well as Deckers' reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

32. Deckers will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9 day of February 2015 at Goleta, California.

_____
Graham Thatcher